GUNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

PARK PLACE CORPORATION,                )   Civil Action No.: 6:14-CV-2614-BHH
                                        )
                          Plaintiff,    )
                                        )
         vs.                            )
                                        )   **Opinion and Order**
SEAMAN CORPORATION,                     )
                                        )
                          Defendant.    )
_____ )

This matter is before the Court on Defendant Seaman Corporation's ("Seaman")
Motion for Summary Judgment (ECF No. 31). For the reasons set forth in this Order,
Defendant's motion is granted.

**BACKGROUND**

This matter involves a dispute over the application of a warranty regarding a
Seaman roofing membrane product installed at Plaintiff Park Place Corporation's ("Park
Place") commercial location, 6801 Augusta Road, Greenville, South Carolina (the
"Property"). Defendant moves for summary judgment on the bases that: (1) there were
no leaks in the roofing membrane during the warranty period that were not repaired by
Seaman pursuant to the warranty, and (2) the hail damage relied upon by Plaintiff is
excluded from warranty coverage.

The loss giving rise to the warranty question occurred as a result of a hail event
or events at the Property. The Property is a large commercial building with a flat roof
that was constructed in 1997. The roofing system installed on the Property at that time
was a Seaman product that came with a warranty, which was issued on or about May

19, 1997, and contemplated a 15-year period of protection for repair to leaks in the roofing system. (Ex. A, Def. Mot. Summ. J., ECF No. 31-1.) Park Place alleges, and the parties' independent inspections and evaluations have established, that the roof was impacted by hail on or about March 31, 2012 and/or on or about April 3, 2012, approximately six weeks before the warranty's expiration on May 19, 2012. (Compl., ECF No. 1 at ¶ 6; Ex. D, ECF No. 31-4 at 5; Exs. E, F, Pl. Resp. Mot. Summ. J., ECF Nos. 37-5 at 2, 37-6 at 3.)

Pursuant to the terms of the warranty, Seaman was to repair any leaks in the roofing system during the applicable period. (Ex. A, ECF No. 31-1.) Specifically, the warranty states:

> **SEAMAN CORPORATION** warrants to the owner named above ("Owner") of the building described herein that, subject to the Terms, Conditions, and Limitations set forth below, for a period of **Fifteen (15) years** commencing with the date of final inspection and acceptance, Seaman Corporation will repair any leaks in the FiberTite Roofing Systems[1] furnished to said commercial building attributable to Roofing Membrane provided by Seaman Corporation and/or defective workmanship provided by Seaman Corporation or its authorized FiberTite Single Ply Roof Applicator.

(*Id.* at 2 (emphasis in original).) Under "Terms, Conditions & Limitations," the warranty states in relevant part: "5. Owner shall give Seaman Corporation written notice at its address set forth herein not more than thirty (30) days after discovery of any leaks in the Roofing System." (*Id.*) Further, the warranty includes the following limitation: "9. This warranty shall not be applicable to nor shall Seaman Corporation be responsible for damage or loss caused in whole or in part by: natural disasters including, but not limited to lightning, hurricanes, tornadoes or earthquakes . . . ." (*Id.*)

Over the life of the warranty, Plaintiff contacted Defendant to report numerous

---

[1] FiberTite Roofing Systems appears to be either a product line or an entity within Seaman Corporation, and is the trade name under which the roof in question was sold. (*See* Ex. A, ECF No. 37-1.)

potential warranty claims. These warranty claims were memorialized by Defendant in a document called "FiberTite Job Tracker." (Ex. B, ECF No. 37-2 at 2.) Approximately thirty-two (32) warranty claims were made by Park Place, resulting in approximately twenty-eight (28) incidents of repair at Seaman's expense. (*Id.*; Ralph Raulie Dep. 37, Ex. C, ECF No. 37-3.) On or about March 22, 2012, Russell Dickard, a maintenance employee of Park Place, called Seaman and reported two leaks in the showroom area of the Property; this call was documented as Service Request 12-0395 in the FiberTite Job Tracker. (Ex. D, ECF No. 37-4 at 2.) The Seaman service representative made the following notation, dated April 4, 2012, in the service request history: "per Tom Cuddy at Wilson roofing have 6 drains that the non-reinforced is cracked, will send me a quote and pictures. Russell called thinks they have hail damage, Tom check it out Thurs or Fri, his guys have been up to do temp repairs." (*Id.*)

In a report dated April 25, 2012, an insurance adjuster for Capstone ISG, Inc., documented an inspection of the roof ("Capstone Report") performed on April 24, 2012 on behalf of Plaintiff's insurance company, Westfield Insurance. (Ex. B, ECF No. 31-2.) The report indicates that the inspection was performed in the presence of the insured (Park Place) and the insured's roofer, Chris Cannon of Cannon Roofing. (*Id.* at 2.) The report further states:

> Our inspection of the single-ply membrane roofing noted no significant bruising and/or fracturing that would be consistent with hail impacts. We noted signs of normal wear and tear to the dwellings [sic] roof where water sits in lower areas and some minor cracking and splitting around the fasteners and seams. No storm related damage to the membrane roofing. The insured's roofer agreed with this assessment. The insured noted that the roof storm drains were replaced right after this storm from damage in order to prevent further damages.

(*Id.*) In his deposition, David Orders, Executive Vice President of Administration for Park

Place, indicates that he was present for at least part of the inspection on April 24, 2012 and that Mr. Cannon reported back to him after being on the roof with the insurance adjuster. (Orders Dep. 17-18, Ex. F, ECF No. 31-6.) The warranty expired on May 19, 2012, approximately three and one half weeks after this inspection was conducted.

In a report dated December 14, 2012, an insurance adjuster for Barker Claim Service, Inc. documented an inspection of the roof ("Barker Report") performed on December 10, 2012 on behalf of Westfield Insurance. (Ex. C, ECF No. 31-3.) The report indicates that the inspection was performed in the presence of Mr. Orders and an engineer, Craig Williams of Rimkus North Carolina, PLLC ("Rimkus"). (*Id.* at 2-3.) In his deposition, Mr. Orders appears to be discussing this December 2012 inspection when he states:

> And I do remember an event which I think was month or two later where I was on the roof, and it was such a bright day, I didn't have sunglasses, and I couldn't even look at the membrane because it was white, and it was so bright. Everybody else had sunglasses on, so I couldn't even stay up there very long because of the intensity of the light. That's all I recall.

(Orders Dep. 19, Ex. F, ECF No. 31-6.) The Barker Report states in pertinent part:

> During our inspection, we found visible hail damage to the coil fins on 8 air handlers that are located on the roof. There is [sic] also some visible hail impacts on several soft metal roof vents spread out across the roof. Many of these impacts are minor and there are several roof vents with no signs of hail damage. At the time of our inspection, Mr. Orders walked a small section of the roof with us and pointed out what he felt was hail damage. We found and chalked these spiral type marks on the north, south and middle sections of the building. These areas do appear to have been caused by an impact of some type however the membranes [sic] surface does not appear to have been cracked or split as a result of the impact. Please be advised that there are countless marks like the ones in our photographs across the entire roof.

(Ex. C, ECF No. 31-3 at 3.)

Mr. Williams of Rimkus prepared an engineer's report ("Rimkus Report"), dated

January 14, 2013, for Westfield Insurance, based on his inspection of the roof on December 10, 2012. (Ex. D, ECF No. 31-4.) The report stated that Rimkus was "retained to perform a roof evaluation and determine the cause of the reported [hail] damage." (*Id.* at 4.) Section II of the Rimkus Report, entitled Conclusions, states:

> 1. The roof was struck by hail as evidenced by the dents in the light gage metal vent caps, the dents in the fins of the HVAC equipment and the circular marks on the roofing membrane. 2. The fractures in the roofing membrane resulted in a reduction of the expected long-term service life of the roof. 3. The roofing membrane was damaged by wind.

(*Id.* at 5.) Mr. Orders, described as present on-site during Rimkus' inspection, was reported as providing the following information: "The Building was constructed in 1997 and the existing roof covering was part of the original construction of the building. During the reported storm large hail stones fell on the roof for a period of approximately 30 minutes. Leaks were noted around the roof drains during the storm. These leaks were repaired." (*Id.* at 6.) Notably, there is nothing in the Rimkus Report about any leaks resultant from the hail storm(s) that were not repaired. In the Analysis section, Mr. Williams defines hail damage to roofing as "'a diminution of water shedding capability or a reduction in the expected long-term service life of the roofing material.'" (*Id.* at 8 (quoting unknown source).) The report further states:

> The individual ring [marks from hail strikes] at the impact locations were fractures in the [thermoplastic polyolefin] membrane surface. These fractures made the membrane more susceptible to degradation from UV light and created locations for *potential* leaks in the roof. . . . The number of hail fractures in the TPO roof membrane indicated that individual repairs to the damage locations would not be practical or cost effective.

(*Id.* (emphasis added).)

In March 2015, Mr. Williams generated a second report ("Rimkus Supplemental Report") upon request of counsel for Westfield Insurance. (Ex. E, ECF No. 31-5.) Mr.

Williams was provided with various deposition transcripts and other discovery materials from this case and was tasked with determining, to the extent possible, the chronology of events related to the reported hail damage and commenting on the roofing membrane material that was damaged by the hail storm(s). (*Id.* at 2, 4.) The Supplemental Report noted that the roofing membrane was made of a Ketone Ethylene Ester material, rather than a thermoplastic polyolefin material as originally believed, and further concluded, *inter alia*:

> 6. A report dated December 15, 2014 prepared for Seaman Corporation by Jim D. Koontz and Associates, Inc. indicated that the Fibertite product was susceptible to fracturing with hail stones as small as 3/4 inch when the roofing material was aged. 7. After examining samples of the roof membrane, Mr. Jonathan Pierson of FTR Technical Services concluded "The impact which has been reported as stemming from hail has compromised the overall integrity of the membrane . . . This roof membrane should be replaced." 8. According to Mr. Russel Dickard of Park Place Corporated [sic], there were internal moisture intrusions at various locations under the roof in the summer of 2012. According to the report by Mr. Jonathan Pierson of FTR Technical Services, there was moisture under the roofing membrane on February 1, 2013. *The inception date of the moisture intrusion could not be determined.* 9. Impacts that resulted in cracks or fractures in the top surface of the membrane material shortened the expected service life of the membrane material and made the material susceptible to the formation of leaks.

(*Id.* at 3 (emphasis added).) Notably absent from the Supplemental Report was any determination or conclusion that unrepaired leaks occurred during the warranty coverage period. In the Analysis section, Mr. Williams states:

> According to Mr. Russell Dickard of Park Place Corporated [sic] there were internal moisture intrusions at various locations under the roof in the summer of 2012. He stated that he made attempts to locate the source of the moisture intrusions through the roofing membrane but these attempts were not successful. He also stated that he did not consider himself to be [sic] roofing expert. Based on the lack of written or recorded testimony or observations, the inception date of the moisture intrusion could not be determined.

> *There was no reported active leaking on the interior of the building immediately after the reported storm event on March 31, 2012. The internal moisture intrusions were not reported until the summer of 2012, in the range of three to six months after the reported hail impacts.* In his discussion of the damaged roofing samples, Mr. Jonathan Pierson stated that approximately 30 percent of the impact marks on the top side of the membrane material have or would compromise the integrity of the membrane. This statement implied that even if leaking of the membrane did not occur immediately after the impacts, the damage to membrane material would result in leaks at a later time. These later leaks would result from cracking of the bottom side of the membrane material due to accelerated degradation of the fiber substrate and stress concentration in to [sic] bottom side where the top side had been compromised. Based on this information it was concluded that impacts that resulted in cracks or fractures in the top surface of the membrane material shortened the expected service life of the membrane material and made the material susceptible to the formation of leaks.

(*Id.* at 6.)

In February 2013, Jonathan Pierson of FTR Technical Services prepared a report ("FTR Report") on behalf of Seaman, based on his inspection of the roof on February 1, 2013 and evaluation of samples removed at that time. (Ex. F, ECF No. 37-6.) Mr. Pierson writes, "Based upon a previous telephone discussion of 1-29-13, with Mr. Orders, there was no current leakage into the structure and my limited internal observations confirmed this." (*Id.* at 2.) He goes on to document his identification of six (6) sample locations; the reason each sample area was tagged; cleaning, "hands and knees assessment," photographing, and patching of each sample area; and any further analysis specific to each sample area. (*Id.* at 2-3.) With regard to Sample 3, which was tagged because there was caulking on the roof surface, the report states: "Please note that there was evidence of a small amount of moisture on the insulation facer under this area as illustrated in picture 35." (*Id.* at 2.) This is the only sample area in which moisture was noted. Later in the report, Mr. Pierson describes the results of his analysis

of the samples using a hand held magnifying glass:

> Top Side Analysis: Very few additional impact fractures were noted via the magnification. The roof top assessment as to the extent of the damages is consistent with those illustrated in the sample photographs #2.

> Back Side Analysis: While not all the impact fracture, which was noted on the top side, was "hard" enough to compromise the back side, I estimated that 30% of the impacts have or will compromise the integrity of the membrane.

> Conclusion: The impact which has been reported as stemming from hail has compromised the overall integrity of the membrane. It is my opinion that while there is no immediate danger of catastrophic failure this roof membrane should be replaced.

(*Id.* at 3.) Defendant states, and Plaintiff has not contested, that Westfield Insurance ultimately paid for the roofing system to be replaced and Plaintiff chose another Seaman membrane roof. (ECF No. 31 at 3.) Further, Defendant asserts that Westfield Insurance, on behalf of and in the name of Park Place, filed the instant action against Seaman. (*Id.*)

In his deposition, Mr. Orders was asked whether he was aware of any active leak in the roofing system when the April 24, 2012 inspection was conducted, to which he responded: "I do not remember." (Orders Dep. 20, Ex. F, ECF No. 31-6.) When asked a series of questions regarding the existence of any evidence of leaks in the roofing system between May 2012 and December 2012, Mr. Orders indicated that he knew of no such evidence. (*Id.* 30-32.) Moreover, Mr. Orders stated that he was not aware of any instance where Seaman refused to repair a leak in the roofing system during the fifteen year warranty period. (*Id.* 46.)

On June 26, 2014, Plaintiff filed suit in this Court asserting causes of action for negligence, breach of contract, and breach of warranties. (ECF No. 1 at 2-5.) Defendant

filed its Motion for Summary Judgment (ECF No. 31) on May 6, 2015. Plaintiff filed its Response in Opposition on June 19, 2015 (ECF No. 37), and Defendant filed its Reply on June 24, 2015 (ECF No. 38). The Court has thoroughly reviewed these filings and now issues the following ruling.

## STANDARD OF REVIEW

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a

reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Under this standard, the existence of a mere scintilla of evidence in support of the non-moving party's position is insufficient to withstand a summary judgment motion. *Anderson*, 477 U.S. at 252. Conclusory allegations or denials, without more, are likewise insufficient. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

## DISCUSSION

Seaman makes the following arguments in support of its Motion for Summary Judgment. First, it claims that as a matter of straightforward factual analysis, it did not breach the warranty. Seaman emphasizes that the warranty covers *leaks*, and states that Seaman will repair any such *leaks* during the warranty period. Seaman asserts that there is simply no evidence of any unrepaired leaks during the term of the warranty. Rather, leaks were reported on March 22, 2012, an inspection revealed problems with six drains, and it is undisputed that the leaks coming from the drains were repaired by the end of April 2012.

Second, Seaman argues that hail damage was excluded by the warranty. Here, Seaman asserts that hail, although not specifically itemized in the limitations portion of the warranty, should be included within the definition of "natural disaster." In support of

this proposition, Seaman draws on two Court of Appeals decisions that include hail in the category of "natural disaster" in the Disaster Assistance Act of 1988 and the Federal Crop Insurance Act respectively. (*See* ECF No. 31 at 6 (citing *Greenhorn Farms v. Espy*, 39 F.3d 963, 963 (9th Cir. 1994); *Meyer v. Conlon*, 162 F.3d 1264, 1266 (10th Cir. 1998).)

Alternatively, if the Court were to determine the term "natural disaster" as included in the warranty to be ambiguous, Seaman argues that the Court must give legal effect to the parties' intentions as determined by the contractual language. *See Beaufort Cnty. Sch. Dist. v. United Nat. Ins. Co.*, 709 S.E.2d 85, 90 (S.C. Ct. App. 2011). When a contract is ambiguous, the Court may consider extrinsic evidence to aid interpretation of the relevant language. *Rhame v. Nat'l Grange Mut. Ins. Co.*, 121 S.E.2d 94, 97 (S.C. 1961). Seaman asserts that in the event of such ambiguity, the Court should look to the parties' expectations and trade usage to define "natural disaster." Seaman contends that it expected hail to be included within "natural disaster" and that at the time the warranty was issued the commercial roofing industry simply did not warrant against hail damage (*see* ECF No. 31 at 7; Raulie Dep. 72-73, Ex. G, ECF No. 31-7; Raulie Affidavit 2-3, Ex. H, ECF No. 31-8); meanwhile, argues Seaman, Park Place did not, indeed could not, have had any expectation about how "natural disaster" would be defined, because Park Place's corporate representative, Mr. Orders, testified that he never even read the warranty until sometime after the hail storm at issue and was ambivalent on the parameters of the term (*see* Orders Dep. 42-44, 48, Ex. F, ECF No. 31-6).

Third, Seaman argues that Plaintiff did not notify Seaman of any alleged leak

resulting from the hail storm(s), and that written notice was a prerequisite to any duty to repair under the warranty. (*See* ECF No. 31 at 8-10.) Here, Seaman cites paragraph 5 of the Terms, Conditions, & Limitations section, which states: "Owner shall give Seaman Corporation written notice at its address set forth herein not more than thirty (30) days after discovery of any leaks in the Roofing System." (Ex. A, ECF No. 31-1 at 2.) Seaman avers that notice of the existence of a leak in the roof is a condition precedent to Seaman's performance under the warranty. (ECF No. 31 at 8 (citing *Byrd v. Livingston*, 727 S.E.2d 620, 623 (S.C. Ct. App. 2012) ("A condition precedent to a contract is any fact other than the lapse of time, which, unless excused, must exist or occur before a duty of immediate performance arises." (internal quotation marks and citation omitted))).) Seaman further argues that such a reading is the only reasonable construction of the warranty language, and that the notice requirement is specifically designed to mitigate damage through early detection and prevent difficulty in determining the actual source of a leak, especially where some causes of leaks (e.g. natural disasters) are excluded from coverage. (*Id.* at 9.)

Fourth, Seaman argues that to the extent Plaintiff's claims are based on alleged breach of implied warranties of merchantability, fitness for a particular purpose, and quality workmanship, such claims are inapposite because Seaman properly disclaimed any implied warranties on the face of the contract. The warranty specifically states:

> SEAMAN CORPORATION MAKES NO WARRANTY THAT THE ROOFING SYSTEM IS MERCHANTABLE OR FIT FOR ANY PARTICULAR PURPOSE, THERE BEING NO WARRANTIES, EXPRESS OR IMPLIED, WHICH EXTEND BEYOND THE FACE HEREOF.

(Ex. A, ECF No. 31-1 at 2.) Seaman asserts that this clause constitutes an effective disclaimer of implied warranties pursuant to S.C. Code § 36-2-316. Plaintiff does not

contest Defendant's motion in this regard. (ECF No. 37 at 8.) There being no disagreement between the parties on this point, the Court finds that Defendant effectively disclaimed any implied warranties and Plaintiff's allegations based on that theory are without merit.

Finally, Seaman argues that the Court should limit damages to $226,500 as a matter of law, because that was the cost of the original roof. The warranty specifically states: "Seaman Corporation will repair any leaks in the Roofing System at its expense, but in no event shall Seaman Corporation's obligation over the lifetime of the warranty exceed the Owner's original cost of the installed roof." (Ex. A, ECF No. 31-1 at 2.) Plaintiff has stipulated to this limit on the total recoverable damages. (ECF No. 37 at 8.) Again, due to an absence of disagreement between the parties, the Court finds that the total amount of recoverable damages is so limited. But this limitation is moot because, as further elucidated below, by way of this Order the Court grants Defendant's Motion for Summary Judgment.

The Court finds that Seaman has born its initial burden of demonstrating that summary judgment is appropriate and shifted the burden to Park Place to set forth specific facts showing there is a genuine issue for trial. *See Celotex*, 477 U.S. at 322.

Park Place responds that Seaman breached the warranty because it failed to investigate reports of potential hail damage that occurred on March 31 and/or April 3, 2012. Plaintiff argues that shortly after it complained about potential damage to the roof from hail, a contractor was sent by Seaman to investigate, and through that investigation discovered that there was cracking in and around six drains. Plaintiff further asserts that although these drains were repaired under the terms of the

warranty, no investigation was conducted with respect to other portions of the roof. Had Seaman conducted an appropriate investigation, avers Plaintiff, it would have learned that the hail storm(s) had damaged the roof to a degree requiring total replacement. (*See* ECF No. 37 at 3.)

In furtherance of this argument, Plaintiff asserts that nothing in the warranty excludes damage resulting from hail. Discussing the "natural disasters" exclusion clause, Plaintiff states, "By specifically identifying various natural disasters, but by excluding hail from the definition, there is a clear fact question about the scope of the warranty, and what is to be included and/or excluded." (*Id.* at 3-4.) Plaintiff points to marketing materials from Seaman's website predating the loss at issue, that purportedly infer that hail damage is warrantied. (*See* Ex. G, ECF No. 37-7 at 2 (discussing in general the value of a roofing membrane warranty and stating, "**Is the warranty pro-rated and does it include exclusions such as ponding water, hail, oil and grease?** *If so, be sure to factor the potential future expenditures to repair or replace a failed roof into your buying decision.*" (emphasis in original)).)

Plaintiff is correct that whether or not hail should be included within the scope of the term "natural disasters" in the warranty is a question of fact, but wrong about the notion that dispute over this question prevents the entry of summary judgment in this case. "If the contract's language is clear and unambiguous, the language alone, understood in its plain, ordinary, and popular sense, determines the contract's force and effect." *Beaufort Cty. Sch. Dist. v. United Nat. Ins. Co.*, 709 S.E.2d 85, 90 (S.C. Ct. App. 2011). "'A contract is ambiguous only when it may fairly and reasonably be understood in more ways than one.'" *Padgett v. S.C. Ins. Reserve Fund*, 531 S.E.2d 305, 307 (S.C.

Ct. App. 2000). "It is a question of law for the court whether the language of a contract is ambiguous. Once the court decides the language is ambiguous, evidence may be admitted to show the intent of the parties. The determination of the parties' intent is then a question of fact." *S.C. Dep't of Nat. Res. v. Town of McClellanville*, 550 S.E.2d 299, 302-03 (S.C. 2001) (internal citations omitted). The Court finds that the term "natural disaster" in the warranty may fairly and reasonably be understood in more ways than one, namely, as including or excluding hail storms. But this ambiguity is immaterial and does not prevent the entry of summary judgment, because, as more fully explicated below, even accepting the non-movant's assertion that leaks ensuing from hail damage are warrantied would not affect the disposition of the case. *See Anderson*, 477 U.S. at 248. Again, "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

Summary judgment is appropriate in this case for the simple reason that Plaintiff has not presented any evidence of a *leak* in the roofing membrane during the term of the warranty about which it notified Seaman, and that Seaman failed to repair. Neither *can* Plaintiff uncover any such evidence through further discovery or at trial as: (1) the relevant witnesses have been deposed and have not been able to provide testimony to aid Plaintiff in overcoming this hurdle, and (2) the roofing membrane has long been replaced and discarded, thereby foreclosing any opportunity for further testing in an attempt to date leaks within the term of the warranty. Plaintiff has shown, and Seaman admits, that the roof sustained damage from hail. However, as Seaman has argued and the Court agrees, the warranty provides no coverage for damage alone; rather, remedies are provided for *leaks* reported during the warranty period. (Def. Reply Mot.

15

Summ. J., ECF No. 38 at 1.)

Plaintiff cites the FTR Report prepared by Mr. Pierson for the notion that "as a result of hail damage, approximately 30% of the roof had been compromised," and "hail in March and April, 2012, well within the warranty period, compromised the roof and resulted in the need for repair." (ECF No. 37 at 4.) Of the six roofing membrane samples taken by Mr. Pierson, he noted a small amount of moisture on the insulation facer under one sample. (Ex. F, ECF No. 37-6 at 2.) However, it is undisputed that Mr. Pierson's discovery of this moisture occurred in February 2013, more than eight months after the warranty expired. Despite Plaintiff's valiant efforts, there is simply no evidence of any leak that went unrepaired by Seaman *during* the warranty coverage period.

At the same time Plaintiff points to Mr. Pierson's conclusion that the roofing membrane should be replaced as evidence of warrantable damage, Plaintiff overlooks the Capstone Report, which documents an April 24, 2012 inspection that revealed no leaks in the roof. Rather, the Capstone Report, prepared at the behest of Plaintiff's insurer, notes "no significant bruising and/or fracturing that would be consistent with hail impacts," "no storm related damage to the membrane roofing," and "the insured noted that the roof storm drains were replaced right after this storm from damage in order to prevent further damages." (Ex. B, ECF No. 31-2 at 2.) Regardless of the fact that this assessment about the lack of hail damage later proved to be inaccurate, the fact remains that the inspection closest in time to the hail storm(s) revealed no existing leaks attributable to the hail.

The next inspection in succession, conducted on December 10, 2012 at Plaintiff's insurer's behest, also revealed no leaks in the roof. The Barker Report generated by the

claims adjuster on site at the time states:

> . . . Mr. Orders walked a small section of the roof with us and pointed out what he felt was hail damage. We found and chalked these spiral type marks on the north, south and middle sections of the building. These areas do appear to have been caused by an impact of some type *however the membranes [sic] surface does not appear to have been cracked or split as a result of the impact.*

(Ex. C, ECF No. 31-3 at 3 (emphasis added).) Furthermore, the Rimkus Report, generated by Mr. Williams who was present for the same inspection, similarly notes no leaks. Thus, Plaintiff's own expert concludes that the hail damage "resulted in a reduction of the expected long-term service life of the roof," but did not actually produce any leaks. (Ex. D, ECF No. 31-3 at 5.) Moreover, the Rimkus Report reiterates that any leaks actually identified were repaired when it documents Mr. Orders' statements at the time of the December 10, 2012 inspection: "Leaks were noted around the roof drains during the storm. These leaks were repaired." (*Id.* at 6.) The Rimkus Report further explains that damage to the roofing membrane is defined as "punctures, fractures, tears or bruises in the membrane to the extent that the substrate becomes exposed. Exposure of the substrate leads to premature degradation of the substrate due to increased exposure to ultra-violet (UV) light." (*Id.* at 8) And such degradation "will result in a reduction of the expected long-term service life of the roof." (*Id.*) But the closest the Rimkus Report comes to documenting actual leaks from the hail is when it says, "The individual rings at the impact locations were fractures in the TPO membrane surface. These fractures made the membrane more susceptible to degradation from UV light and created locations for *potential* leaks in the roof." (*Id.* (emphasis added).) Putting aside the fact that the underlying inspection was conducted six months after the warranty expired, "potential leaks" are not the same as actual leaks.

Mr. Williams' second report, the Rimkus Supplemental Report, is similarly unavailing to Plaintiff as a source of evidence of unrepaired leaks during the warrantied period. In March 2015, at Plaintiff's counsel's direction, Mr. Williams was tasked with reviewing the pleadings, deposition transcripts, and discovery materials in this case in order to develop a chronology of events related to the hail damage and comment on the roofing membrane material damaged by the storm(s). (Ex. E, ECF No. 31-5 at 2, 4.) The relevant language from the Rimkus Supplemental Report states:

> According to Mr. Russell Dickard of Park Place Corporated [sic] there were internal moisture intrusions at various locations under the roof in the summer of 2012. He stated that he made attempts to locate the source of the moisture intrusions through the roofing membrane but these attempts were not successful. He also stated that he did not consider himself to be [sic] roofing expert. *Based on the lack of written or recorded testimony or observations, the inception date of the moisture intrusion could not be determined.*
>
> There was no reported active leaking on the interior of the building immediately after the reported storm event on March 31, 2012. *The internal moisture intrusions were not reported until the summer of 2012, in the range of three to six months after the reported hail impacts.*

(*Id.* at 6.) It is notable that Plaintiff does not contest that the moisture intrusions Mr. Dickard apparently described in his deposition were not discovered until the warranty had already expired, nor that the inception date of such intrusions could not be discovered. Plaintiff's own expert has concluded as much. The Court accepts Defendant's invitation to take judicial notice that summer 2012 began on June 20, approximately one month after the warranty period ended. It is further notable that Plaintiff does not use Mr. Dickard's deposition testimony in support of its Response in Opposition to the Motion for Summary Judgment. (*See* ECF No. 37.) The Court can only conclude that there is no further specificity therein which would date the moisture

intrusions within the warrantied period. Plaintiff asserts that, "At the very least, there is a question of fact as to whether and to what extent leaks existed as a result of the hail damage which occurred in March/April, 2012." (*Id.* at 5.) But the Court disagrees. Defendant has made its initial showing that summary judgment is appropriate and shifted the burden to Plaintiff to show some evidence of leaks that went unrepaired during the term of the warranty. Plaintiff has failed to do so, and the Court enters summary judgment accordingly.

Mr. Orders deposition testimony is further support for *the absence* of any leaks that went unrepaired during the warrantied period. When asked whether he was aware of any active leak in the roof at the time of the April 24, 2012 inspection, he stated "I do not remember" before going on to discuss the drain leaks that were appropriately repaired. (Orders Dep. 20, Ex. F, ECF No. 31-6.) When asked if he was aware of any evidence that there was an existing leak between May 2012 and December 2012, he stated "I am not." (*Id.* 30-32.) When asked whether he, as the management representative for Park Place, contended that Seaman failed to repair any leaks during the warranty period, he stated "I'm not aware of any refusals to repair leaks by Seamans [sic]." (*Id.* 46.)

The parties are at odds about whether Plaintiff notified Defendant of leaks during the warrantied period, thus triggering Defendant's duty to make repairs. Seaman argues that notification of a specific leak is a condition precedent to its duty to make repairs under the warranty, citing paragraph 5 of the Terms, Conditions & Limitations section. (*See* Ex. A, ECF No. 31-1 at 2 ("Owner shall give Seaman Corporation written notice at its address set forth herein not more than thirty (30) days after discovery of any leaks in

19

the Roofing System.")); *see also Byrd v. Livingston*, 727 S.E.2d 620, 623 (S.C. Ct. App. 2012).[2] Meanwhile, Plaintiff cites an April 4, 2012 service note associated with the March 22, 2012 service call (Ex. D, ECF No. 37-4 at 2) as evidence that Park Place met its burden of notifying Seaman, thus triggering a duty on Seaman's part to investigate potential hail damage and make any necessary repairs. The undisputed evidence reflects that the two roof leaks reported on March 22, 2012 were inspected, determined to be resultant from problems with six drains, and repaired by approximately April 18, 2012, when the repair ticket was closed out. (*See id.* at 2-3; Ex. B, ECF No. 37-2 at 2.) Putting aside any technicalities about the required notice being in writing, the Court agrees with Seaman that notice of an actual leak is a condition precedent to Seaman's duty to repair. This is the only reasonable construction of the warranty language as a whole. Such a notice requirement is, of course, designed to put the onus of discovering any leaks on the building owner, as Seaman cannot possibly be responsible for ongoing monitoring of all the roofing membranes it installs. The only actual leaks of which Seaman was notified in the time period relevant to this case were those indicated by Mr. Dickard on March 22, 2012. Those leaks were properly repaired, and an inspection conducted at the direction of Plaintiff's insurer one week later (Capstone Report) revealed no ongoing leaks. Again, Seaman has shown that summary judgment is appropriate and Plaintiff has not produced evidence of any leak it reported during the term of the warranty and which Seaman failed to repair.

Finally, to the extent that Plaintiff advances negligence as a theory of liability in

---

[2] "The question of whether a provision in a contract constitutes a condition precedent is a question of construction dependent on the intent of the parties to be gathered from the language they employ." *Byrd*, 727 S.E.2d at 623 (quoting *Brewer v. Stokes Kia, Isuzu, Subaru, Inc.*, 613 S.E.2d 802, 805 (S.C. Ct. App. 2005).

this case, the Court grants summary judgment with respect to that claim as well. In its Complaint, Plaintiff advances, *inter alia*, a litany of alleged failures by Seaman to exercise due care in designing, manufacturing, selling, testing, and distributing its roofing products, as well as alleged failures to instruct, supervise, monitor, and retain competent employees and agents. (*See* ECF No. 1 at 2-4.) However, it is entirely unclear what the source of duty is in all of these putative negligence claims. In the briefing on the Motion for Summary Judgment, Plaintiff appears to have narrowed its negligence theory down to the notion that because Mr. Dickard mentioned potential hail damage in a service call to Seaman, this invoked a general duty on Seaman's part to conduct an in-depth inspection of the roofing membrane. On this point the Court would say very little. Seaman had no affirmative duty to discover leaks based on a report of potential hail damage. Plaintiff's Response in Opposition to the Motion for Summary Judgment is devoid of citation to any authority to support the assertion that such a duty exists at common law. The Court finds that no such duty is imposed by the language of the warranty. As noted above, the warranty places the onus of discovery and notification of leaks on the building owner. And even if Seaman had investigated, Plaintiff has submitted no evidence that Seaman would have found any leaks. Indeed, the available evidence suggests the contrary. The inspection occurring closest in time to the hail storm(s) was documented in the Capstone Report, which notes "no significant bruising and/or fracturing that would be consistent with hail impacts," "signs of normal wear and tear," and "no storm related damage to the membrane roofing." (Ex. B, ECF No. 31-2 at 2.) Moreover, Park Place's roofer, Mr. Cannon, who was present for the inspection, agreed with that assessment. (*Id.*)

The warranty at issue was to repair leaks, not to replace the roof if damage led to fractures and fissures that would reduce its lifespan. As such, Defendant's Motion for Summary Judgment is granted.

### **CONCLUSION**

After careful consideration of the parties' briefs and the associated record, the Court GRANTS Defendant's Motion for Summary Judgment.

**IT IS SO ORDERED.**

/s/ Bruce Howe Hendricks
United States District Judge

March 14, 2016
Greenville, South Carolina